State *v.* Insurance Co.

STATE *v.* INSURANCE CO.

(*Nashville.* January 19, 1901.)

1. TAXATION. *Foreign life insurance company not liable for privilege tax, when.*

A foreign life insurance company that has, by the State's comity, engaged for a time in business within its borders, through local and resident agents, soliciting and taking policies from its citizens and collecting premiums thereon, may, by ceasing to solicit and take new policies and by recalling its agents from the State, thereby compelling the payment of premiums by mail or express to its office outside the State, evade the payment of the privilege tax of 2½ per cent. on gross premium receipts imposed by statute on all foreign life insurance companies, and, at the same time continue its business by keeping alive all of its old policies taken originally by its resident agents, and by receiving and collecting through the public agencies of mail and carriers, the renewal premiums on such policies, in competition with other taxpaying companies, both foreign and domestic.

Cases cited: Ins. Co. *v.* Ins. Co., 11 Hum., 25; Dugger *v.* Ins. Co., 95 Tenn., 245; Young *v.* Iron Co., 85 Tenn., 196; Spratley *v.* Ins. Co., 99 Tenn., 322 (S. C., 172 U. S., 611.)

2. SAME. *Same. Case in judgment.*

The Connecticut Mutual Life Insurance Company, after having, by the State's comity, done business in the State for a time, ceased, on July 1, 1894, to solicit or take new policies, and recalled its resident agents. It then had 369 policies in force in the State, which its resident agents had secured. It kept these policies alive, collecting the renewal premiums by mail or express. After the recall of its agents and before institution of this suit, it had collected thereon $134,526.96. If liable for the same tax—2½ per cent. on gross premium receipts—that other foreign companies paid, it owed the State $3,363.17. The Court held the company was not liable.

State *v.* Insurance Co.

3. SAME. *Same. Construction of clause in revenue acts, relating to.*
The Court holds that the clause in the revenue Act of 1897, re-enacted in the revenue Act of 1899, providing that life insurance companies of other States and foreign countries ceasing to transact new business in the State shall continue to pay the tax of 2½ per cent. on gross premium receipts that they may thereafter collect from business which they had secured while in the State, has no application to or does not reach this company, which had recalled its agents and ceased to take new business before the passage of these acts. It is not quite clear whether the Court intends to hold that the Legislature has not the constitutional power to pass a statute that would reach this company and others in like situation, or merely to decide that it has not done so.*

Acts construed: Acts 1897, Ch. 2; Acts 1899, Ch. 432.

4. INSURANCE, LIFE. *Payment of premium, where made.*
The Court holds that delivery of a letter or package, containing renewal premiums on a life policy, to a post office or carrier within the State, addressed to the company at a point outside the State, does not constitute delivery or payment of such renewal premium to the carrier within the State, and that such delivery and payment does not become complete and effective until actual receipt of the premiums by the company at its office, and that the money remains, in the meantime, at the risk of the sender.†

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County. Hon. HENRY H. COOK, Ch.

*The Legislature, at its recent session, passed a statute which undertakes to remedy this injustice and hardship and to prevent the discrimination in favor of foreign as against taxpaying domestic companies, and the discrimination in favor of a retiring foreign company as against a foreign company that remains, which results from the present state of the law as declared in this case.—REPORTER.

†See on this point p. 317, post and note.—REPORTER.

ATTORNEY-GENERAL PICKLE for State.

JOHN J. VERTREES and FRANCIS FENTRESS for Insurance Co.

WILKES, J. Prior to July, 1894, the Connecticut Mutual Life Insurance Company prosecuted its business of life insurance in the State of Tennessee through resident agents and local and general agencies. At that date it withdrew from the State, so far as soliciting or attempting to do any new business was concerned, leaving, however, quite a large number of policies in force.

From July, 1894, to July, 1899, it received from policy holders residing in Tennessee premiums aggregating $137,384.47. Of this sum $134,526.96 was collected on policies originally solicited and taken in the State, and $2,857.50 on policies taken out originally in other States, and whose holders had subsequently moved to the State.

For many years the State has exacted of foreign insurance companies a privilege tax of "2½ per cent. of gross premium receipts, payable semi-annually, January and July." Acts 1893, Ch. 89, Sec. 6; Acts 1895, Ch. 160, Sec. 19; Acts 1897, Ch. 2, Sec. 5.

The tax, without interest, due on this volume of business is $3,363.17 on policies taken originally in Tennessee, and $71.43 on policies taken originally elsewhere.

The defendant's contention is that it withdrew from the State and its jurisdiction in July, 1894; that it has not since been "doing business" in the State; and that it is therefore not liable to this tax.

What the defendant company did in 1894 was to recall its agents and agencies from the State, and cease to solicit and write new policies. It kept alive its existing policies by receiving premiums thereon as before, except that the money was sent by mail or otherwise to defendant's agents or agencies outside the State, and not paid to the company in the State.

The Chancellor was of opinion that the company was not liable for the tax, and so decreed, and the State has appealed and assigned as error this holding of the Chancellor.

The defendant company is a foreign corporation not engaged in interstate commerce, and it is conceded that the Legislature has power to prescribe the terms on which it may be permitted to do business in Tennessee. *Ins. Co.* v. *Ins. Co.,* 11 Hum., 25; *Dugger* v. *Ins. Co.,* 95 Tenn., 245; *Young* v. *Iron Co.,* 85 Tenn., 196.

The only question at issue is whether the company, under the facts in the case, after its withdrawal from the State in 1894, leaving a portion of its policies in force, was thereafter doing business in Tennessee, by receiving by its officers, in another State, through the mails and

express, the accruing premiums on such policies.

It is insisted by the State that to allow an insurance company thus to continue its business by receiving the premiums would be an easy evasion of the law. It must be observed that the tax as laid is not a gross sum for doing business, but a tax upon the gross premiums received by the company.

These policies were all upon the usual plan; that is to say, the assured paid the first premium and received the policy. Such payment kept the policy in force for a year. It was the right and privilege of the policy holder to renew the policy for another year, by paying another premium. Such premium is known as a "renewal premium." It is optional with the assured to pay it, but obligatory upon the company to receive it. The company cannot compel the assured to pay a renewal premium, but he can compel the company to receive it, or, what is equivalent, keep the policy alive by tendering it.

When the company withdrew from Tennessee (July 1, 1894) there were 369 policy holders in the State (thirty-four of whom had been insured while citizens of other States) holding policies which provided, in terms, that all premiums should be paid at the company's home office, in Connecticut, unless, for the policy holder's convenience, it should, from time to time, be otherwise

arranged. Many of these policies are still in force, but 104 have either matured or lapsed.

None of the premiums were, after withdrawal in 1894, received by the company in Tennessee, but were sent to it by mail or express to Kentucky, or the home office in Connecticut.

The Act of the General Assembly pertaining to foreign corporations refers, by its terms, to their admission, their retirement, and their exclusion. Section 9 of the Act, which provides for the exclusion of such corporations from the State, prescribes the manner in which it shall be done, and says, "Upon the doing of these acts the agents of the company are required to discontinue the issuing of any new policies or the collection of any premiums." It is argued, therefore, that the Act, by its terms, defines the "doing of business" to be the issuance of policies and collection of premiums in Tennessee, and it is also contended that neither of these things has been done since the withdrawal of the company.

We think it clear that a foreign insurance company which issues to a citizen of Tennessee a policy is not doing business in Tennessee if it receives the application in a foreign State, and without solicitation in Tennessee, and if it, in addition, executes and delivers the policy and receives the premiums in such foreign State. In such case there cannot be. said to be any "doing of business" in Tennessee by the foreign corpora-

tion that would subject it to tax. A tax in such cases would be invalid and such legislation would be unconstitutional and void. *Allgeyer* v. *Louisiana,* 165 U. S., 578; *Eastern B. & L. Assn.* v. *Bedford,* 88 Fed. Rep., 7.

It is insisted on behalf of the State that the present case is controlled by that of *Spratly* v. *Connecticut Mutual Life Ins. Co.,* 15 Pick., 322. In substance that case is this: Prior to 1894 the company, while doing business as a foreign insurance company in Tennessee, insured the life of B. R. Spratly, a citizen of Tennessee, upon an application made in Tennessee, and by a policy delivered in Tennessee. The company afterwards, on July 1, 1894, withdrew from the State. Mr. Spratly died in 1896. Proofs of his death were filed, and claim made by his widow, also a citizen of Tennessee. Thereupon, in May, 1896, the company sent an agent named Chaffee into Tennessee "to investigate his claim, and the conditions under which the death occurred." He was also authorized to, and did, make a proposition of compromise while here (15 Pickle, 324, 332).

Under §§ 4543-4546 of the (Shannon) Code it was held that the company had transactions in Tennessee with regard to the policies, before and at the time of their delivery, and was doing business with reference to them, through Chaffee, in Tennessee, when process was served on him, and therefore the process and service were suffi-

State *v.* Insurance Co.

cient to bring the company before the Court. 15 Pick., 332.

It will be observed:

(*a*) That the company had done business and had this transaction in Tennessee;

(*b*) That Chaffee, as agent, had come into Tennessee in a representative capacity, as agent;

(*c*) That he had come with respect to the original Tennessee transaction; and,

(*d*) That undeniably an agent of the company was in Tennessee, and in a representative capacity, and consequently the sole question was whether, under such circumstances, process could be served on the agent so as to bind the company. It was held under the peculiar statute that it could.

The case was carried to the Supreme Court of the United States, and is reported in 172 U. S., 602. The judgment of the Supreme Court of Tennessee was affirmed. The Federal question in the case was whether the Court below had jurisdiction to render a judgment on the service of process on Chaffee. If it had not, the company had been denied "due process of law." 172 U. S., 609. The Court held that by continuing the old policies in force, and collecting· the premiums in another State, and sending a regular general agent into the State to investigate and with authority to settle, the company was "doing

22 P—19

business" within the State as far as is necessary "within the meaning of the statute." Shannon, §§ 4543-6.

The provisions of the statute (Shan.), §§ 4543, 4546, are special and somewhat peculiar. By the first section it is provided that "any corporation claiming existence under the law of another State found doing business in this State, shall be subject to suit here to the same extent that corporations of this State are by the laws thereof liable to the same, so far as relates to any transaction had, in whole or in part, within this State, or any cause of action arising here, but not otherwise."

Section 2 of the Act defines what is meant by the terms "found doing business" in this State in these words:

"Any corporation having any transactions concerning any property situated in the State through any agency whatever acting for it within this State, shall be held to be doing business within the meaning of section 1."

Section 3 provides that "process may be served upon any agent of said corporation found within the county when the suit is brought, no matter what character of agent such person may be, and in the absence of such agent it shall be sufficient to serve the process upon any person if found within the county when the suit is brought, who

represented the corporation at the time the transaction out of which the suit arose took place.

This Court, speaking of the applicability of the Act to the facts of that case, said: "Not only had the complainant transactions in this State with regard to the policies before and at the time of their delivery, but through its agents was found doing business in respect to them at the time of the institution of this suit, and it cannot be otherwise than that this agent would be reasonably certain to inform his principal of the fact."

It was further said, in regard to the facts of that case:

"Certainly the corporation cannot be heard to complain, whatever others might do, because the agent upon whom service was made in this case was at the time within the State as the representative of the complainant, examining for it into the conditions under which Spratly's death occurred, and, finally, upon the authority of his employer, submitting a proposition of compromise of the claim now in controversy." In that case it is evident this Court gave weight to the fact that an agent of the company was within the State negotiating with regard to the settlement of the policy and this, under the provisions of that Act, was "doing business" in such sense as to justify and warrant service of process.

It is true this Court said: "From July, 1894,

down to the time the suit in the Circuit Court was brought, complainant company was doing a limited business in Tennessee. It had a large number of policies in the State, from which it collected it premiums at stated intervals," and the Supreme Court of the United States said: "Its outstanding policies were not affected by its withdrawal from the State, and it continued to collect the premiums upon them and to pay the losses arising thereunder, and it was doing so at the time of the service of process upon its agent." *Spratly* v. *Conn. Mutual Life Ins. Co.*, 172 U. S., 611.

Whether these premiums were paid in Tennessee or beyond its borders does not appear by express statement, but it may fairly be inferred from the statement in the opinions that is was treated as if the payments had been made in the foreign State. It is evident, however, that both Courts laid great stress upon the fact that the corporation had an agent in Tennessee adjusting the claim and with authority to settle the same, and this, under the provisions of the Act, was sufficient to authorize service upon him and for holding that the corporation was "doing business" in the State.

Hewever this may be, the question now before the Court is upon a different state of facts and under a different statute.

The inquiry is not whether a regular agent,

doing something in the State for the company
in connection with the receipt of premiums, causes
it to be "doing business" in the State so as to
be sued under the service of process Act of
1887, but whether the mere receipt in another
State of renewal premiums from persons resid-
ing in Tennessee, who remit by mail or otherwise
—that and nothing more—is "doing business" in
Tennessee within the meaning of the laws regu-
lating and taxing the business of life insurance
in Tennessee.

It was said in *Eastern B. & L. Assn.* v.
*Bedford,* 88 Fed. Rep., 4, 17, in regard to this
service of process provision of our Code, that it
is a special statutory definition for a particular
purpose, and cannot be perverted to the purposes
of an interpretation of another Act, where only
a similar phraseology is used for an entirely dif-
ferent purpose. This was said by the Circuit
Court of the United States for the Western Dis-
trict of Tennessee, in a case wherein a transac-
tion with a citizen of Tennessee in the State of
New York, involving lands in Tennessee mort-
gaged to the foreign corporation, was held not to
be "doing business" in Tennessee.

In *Norton* v. *Union Bank and Trust Co.* (8
Am. & Eng. Corp. Cases, N. S., 610) it was
held by the Court of Chancery Appeals and the
Supreme Court of Tennessee, that a foreign cor-
poration which had no agent or place of busi-

ness in Tennessee, and had loaned money in another State, on application sent to it through the mail by citizens of Tennessee, and had taken a mortgage, at its home office, on lands in Tennessee to secure the loan, did not "transact business" within the meaning of the Act requiring foreign companies to register their charters.

We think the Spratly case is not conclusive of the real point at issue in the present controversy.

The term or phrase "doing business" does not have, and cannot have, a uniform and unvarying meaning, but is governed largely by the connection, and in view of the object of the statute, and these statutes are governed largely by the objects intended to be effected by them.

We may admit that the receipt of premiums is doing business, but when such receipt is made in a foreign State it does not amount to doing business in Tennessee, but in such foreign State. When the premium is paid and the renewal made and completed in a foreign State, we are unable to see how any business is done in Tennessee. Neither the policy is renewed or continued, nor is the money paid in Tennessee, but both are in the foreign State. There is nothing done in Tennessee, no new business done or solicited, no agent there and no agency, no contract made, no money paid, no receipt for renewal given, and no business done of any character. The postal and express authorities are not the agents

·of the company, but of the insured, as the company's policy stipulates that the premiums shall be paid at the home or foreign office.

It is said that this view will operate harshly ·upon domestic companies and such foreign companies as continue to issue policies and do an .active business in the State. In other words, that .a company may come into the State and write a large number of risks, then withdraw and collect its premiums in another State, and thus escape taxation while it receives the protection of the laws of the State. It is true such condition of affairs might arise, but we cannot decide the question before us upon any consideration of expediency or public policy, but upon a proper construction and application of the law as we find it.

We are of opinion this company, under the facts, is not liable for the tax, and the decree· ·of the Chancellor is affirmed and the bill of the State is dismissed, at its costs.

---

BRIEF OF G. W. PICKLE, ATTORNEY-GENERAL, ON PETITION TO REHEAR.

*Statement of Case.*—The effect of the Court's decision upon the Insurance Department may be aptly illustrated by supposing that the Attorney-general has been called upon to answer the following letter · from the Insurance Commis-

sioner, presenting some of the questions that must naturally arise:

INSURANCE BUREAU,

NASHVILLE, TENN., January 21, 1901.

HON. G. W. PICKLE,

NASHVILLE, TENN.:

*Dear Sir*—The Insurance Department needs and desires your opinion and advice upon the following questions:

Several of the foreign insurance companies, both fire and life, that have heretofore been doing business in the State, and paying the tax of $2\frac{1}{2}$ per cent. of their "gross premium receipts" without question, claim that they are not liable for this tax under the recent decision of the Supreme Court, in the Connecticut Mutual Company's case. Their contention is that they are not doing business in the State, because, under their methods, they do not collect or receive premiums in the State, but outside the State, at their home office or other agencies.

1. The New York Life maintains a large corps of agents in the State, who solicit and forward applications for insurance, receive and deliver policies to citizens, and adjust losses; but these agents do not receive or collect either initial or renewal premiums. When notes are taken for premiums, they are made payable at the home office, and sent direct to the home office by the makers. All premiums are paid direct to the

home office through mail or express agencies. The agents are paid salaries. This company insists that it receives no premiums *in the State,* and is not, therefore, liable for tax. Is it liable for tax?

2. The Mutual Benefit Life does business by a like metuhod, except that the premiums on its policies, both initial and renewal, are made payable just ten days before the date prescribed for the return of the semiannual reports of these companies to this department.

These premiums are made payable outside the State, either at the home office or other agency. This company takes the precaution to withdraw all its agents from the State, and ceases to. solicit and take new business during the periods that its premiums fall due and are paid, which likewise cover the date at which semiannual reports are required to be made. Although this company prosecutes actively and vigorously, through resident agents, a large business in the way of soliciting and taking policies and adjusting losses for eleven months of the year, it insists that it cannot be held for the $2\frac{1}{2}$ per cent. tax on "gross premium receipts," especially on renewal premiums, because it collects no premiums *in the State,* and had *withdrawn from the State at time premiums on its old business were paid.*

This company's claim seems to have the sup-

port of the opinion in the Connecticut Mutual case. Is it liable for taxes?

3. The Globe Life Insurance Company, that has for many years been doing a large business in the State, was during last year excluded from the State, its license revoked, and renewal license refused, because its financial condition was not satisfactory, and it had been guilty of gross frauds. The company, at the time of its exclusion, had 10,000 policy holders in the State, obtained while operating here. It claims the right to continue this business with the citizens of the State, notwithstanding its exclusion for insolvency and fraud, and to do so without even paying the tax on premiums collected. The premiums are payable and are collected at the home office.

Its business is conducted by correspondence, and premiums paid through the agency of the mails and express.

If this company is correct, it is benefited, as regards its old business, to the extent of this tax by its exclusion for fraud and insolvency. Can this company continue this business at all, and if so, without payment of tax?

4. The Connecticut Mutual Life Insurance Company, emboldened by its success, has established agencies at Louisville, Ky., Asheville, N. C., Dalton, Ga., Grand Junction, Miss., and perhaps at other points on the borders of Tennessee, to op-

State *v.* Insurance Co.

erate in Tennessee through the mails and express companies.

It does not propose to put any private local agency in the State, but to operate through these public agencies.

It already has several hundred policies, taken while operating in the State through resident agencies. It claims exemption from regulation and taxation, not only on its old business, but on its new, which promises to be considerable.

As other companies threaten to adopt like tactics, in order to be at no disadvantage, I wish to know if this company is liable for any taxes at all.

5. Some foreign companies, that have conducted their business without collecting premiums *in the State,* claim a return of taxes paid before the recent decision. Are they entitled to return of taxes collected under the statutes declared void or ineffectual ·by the recent decision?

Is the Commissioner liable personally to these companies for taxes collected under the invalidated acts?

The importance of these questions will appear when it is known that there was realized from the tax of $2\frac{1}{2}$ per cent. of "gross premium receipts" of foreign insurance companies alone $141,938.20 for 1899, and $143,263.36 for 1900, as shown by the Treasurer's report.

Not one of the above named companies, except

the Globe, pays less than $3,000 taxes per annum to the State, and some of them as much as $11,000 per annum. If their present contention is sustained, it can be readily seen that this department will be practically . wrecked. The State will lose the large and increasing revenue derived from this source.

The department has always been conducted upon the theory (and, since 1895, upon the authority of your legal opinion) that insurance companies that actually do business in the State by soliciting applications, issuing policies, adjusting losses, etc., and actually receive the profits of the business, are liable for this tax, whether they do this business through private, local agencies, or through such public agencies as the mail and express companies, and that they are liable when they actually do all parts of the business, except receipt of the premiums through local agents in the State, although the premiums are sent by mail or express. In fact, it has been considered that payment by deliverey to public agencies in the State, is as much a payment *in the State* as a payment through private agencies in the State. It has been deemed that the tax is exacted, not for the collection of premiums merely, though fixed on the basis of premium receipts, but for the privilege of doing each and every part of the business—soliciting applications, issuing policies, adjusting losses, as well as collecting premiums.

In view of the Court's decision, it will be nec-
essary to readjust the affairs of this department
along different lines from those prescribed by your
opinion of 1895, and I shall be glad to have
your suggestions at an early date. The decision
seems to deny the State the power to deal ade-
quately with foreign companies in the matter of
taxation, and it may be the wisest course, in
justice to domestic companies, that can be and
are taxed, to abandon the effort to raise revenue
from this quarter. Very truly,

REAU E. FOLK,
*Insurance Commissioner.*

The above letter will sufficiently suggest and
indicate the confusion and difficulties that will
attend the administration of insurance matters
under the principles declared in the recent opinion
of the Court. But for this decision it would be
a complete answer to all these questions and
difficulties, to point to the long settled and uni-
form practice of the Insurance Department, which
has never, in any case, been departed from, and
never, except in this particular instance, challenged
by any foreign company.

II. *Brief and Argument.*—The conclusion that
defendant is not liable for the tax sued for
must rest upon one of two propositions: either

(1) That there is no statute imposing the tax
upon this company, or

(2) That the statutes, if there are any, are unconstitutional, or for other reasons ineffectual.

To sustain the latter proposition would leave the State without power to impose this tax at all—a very serious situation.

I am firmly convinced that the construction of the statutes and of the powers of the Legislature is too narrow, and will practically wreck the Insurance Department, which shall hold that this tax of $2\frac{1}{2}$ per cent. on "gross premium receipts" laid upon foreign insurance *companies* does not attach unless the premiums are collected or received by local agents of the company within the borders of the State, even though the policies on which such premiums are paid were originally solicited, issued, and delivered through local agents operating in the State, and the premiums upon which the tax is reckoned were paid through the agencies of the mails and express companies.

This construction admits foreign insurance companies to solicit, issue, and deliver policies and to adjust losses through local agents or agencies in the State without payment of any taxes, if they shall arrange to have the premiums sent by mail or express direct to the home office or other agency outside of the State—an evasion of the law so obvious and easy as to make it optional with the foreign companies whether they will observe it. No such construction of a statute is admissible if any other is reasonable or possible.

It is to make the statute say to foreign companies: "Pay this tax if you want to, but if it is objectionable to you, simply have premiums sent to the home office and continue business in Tennessee, in competition with other taxpaying companies, without paying any taxes."

The language, as well as the manifest policy of the statutes, forbids such construction.

The Insurance Acts impose the payment of this tax as a *condition* to the admission of foreign companies into the State to engage in business, and forbid them to do business without its payment, and authorize revocation of their license for failure for sixty days to pay same.

The Revenue Acts declare certain privileges, and tax same. Among these are "insurance companies," the tax upon which is measured by a per cent. of "gross premium receipts." This is not a tax laid specifically upon the collection of premiums. That makes a sieve of the statute, and leaves it no vitality or force. It is a tax, in terms, upon insurance *companies*. That is the name given to the privilege.

This means, obviously, the vocation or business of insurance—the doing of insurance. It does not mean to tax a mere name or existence. The business of "insurance companies" consists, not merely in ·collecting premiums, but largely and chiefly in soliciting, issuing, and delivering policies, and in adjusting losses. It is upon this entire business,

and upon every part of it, that the tax is laid. The defendant consented to pay this tax as one of the conditions of its admission.

It is not essential that it shall do *every part* of insurance business to render it liable for tax. It is enough if it does *any part* of it.

It is liable if it solicits alone, or if it delivers policies alone or if it collects premiums alone, in the State. Any other construction would make nonsense of our entire system of privilege taxation. What privilege is exercised to its full extent, or in all its parts? If to omit to exercise the whole business avoids the tax, what privilege tax cannot be evaded?

The revenue statutes specially provide that privilege taxes shall attach, if any thing is done in the particular line of business, "whether they make a business of it or not." To hold that this tax attaches alone to the collection of premiums, leaving all other insurance business free, is like taxing a merchant on the value of his yardstick, and leaving the value of his goods free.

That the practices suggested by the above letter have not hitherto prevailed is attributable to the fact that they have been supposed to be illegal, forbidden, and unavailing, and have been repressed by the insurance department with a strong hand.

That defendant, in the face of these discouragements, has been able to maintain a profitable

business in the State for six years without effort, suggests what can be done, when, released from legal restraints, it shall pursue its business actively through the mails. It has lost only about five per cent. of its policy holders per annum during the six years. It has maintained an average of $27,000 premium receipts.

1. *There are, without question, statutes which, if valid and applicable, render this company liable for the tax sued for. These statutes are so plain that they do not admit of construction or doubt.*

The agreed facts are that this company, after having done business in the State for a quarter of a century in the usual way, ceased in 1894 to solicit new business and withdrew its local agents.

It had, at this date, several hundred policies which its local agents had solicited and procured while operating in the State.

It continued to collect premiums and adjust losses upon these policies, but did it in the State by the use of public agencies, such as the mails and express companies, instead, as formerly, by its own private and local agencies. It collected an average of over $27,000 per annum on these policies, and it is for the tax measured by these "gross premium receipts" that the State seeks to recover.

22 P—20

The Revenue Acts of 1897 and 1899, in connection with the imposition upon *foreign insurance companies* of a privilege tax of "2½ per cent. of gross premium receipts, payable semiannually, January and July," provide that *"life corporations of other States and foreign countries, ceasing to transact new business in this State, shall continue to pay the taxes herein provided on business in force, and until the same be terminated."* Acts 1897, Ch. 2; Acts 1899, Ch. 432.

These provisions embrace and tax the premiums collected by this company after its so-called withdrawal, if it be possible to do so.

Thus, it appears unquestionably that the Revenue Acts of 1897 and 1899 provide for the taxation of this company after its so-called withdrawal.

It is settled in this State, and by an overwhelming preponderance of judicial opinion elsewhere that life policies are not contracts from year to year, but entire and continuing contracts that terminate only with the death of the assured, or his failure to pay stipulated premiums. *Ins. Co.* v. *Heidel,* 8 Lea, 498; *Ins. Co.* v. *Stathan,* 93 U. S., 30; 2 Joyce on Ins., Sec. 1102; 49 Me., 200; 59 Ill., 123; 19 N. Y. Supp., 481; 78 N. Y., 114.

Nor can this company evade the force of this statute by the insistence that it had withdrawn from the State before its passage. It had not;

withdrawn as to these policies, but was receiving from them precisely the same premiums by public agencies as it would have received by its private agencies. If this business had not been previously taxed (which is not admitted), it was competent for the Legislature to tax it. The Legislature has absolute, uncontrolled discretion over foreign corporations. They have no vested rights to have the tax laws remain unchanged. Even .domestic corporations and citizens have no such right. As well might a nonresident, citizen, or corporation, purchasing land in the State, contend that the rate of taxation can never be raised over that existing at date of the purchase. It was, as we shall elsewhere see, a condition of this company's admission that it would pay taxes imposed on its business. The Court will not seriously entertain the proposition that a foreign insurance company, that has been the guest of the State for a time, may leave, taking part of the valuables of its host, and that the State has no power to prevent such result.

But other provisions of the Revenue and Insurance Acts taxed this company upon the basis of its "gross premium receipts," after its so-called withdrawal, without the aid of said direct and specific provisions of the Revenue Acts of 1897 and 1899 on the subject.

The "Insurance Act of 1895" declares it "unlawful for any company to make any contract of

insurance upon or concerning *any property or interests or lives in this State or with any resident thereof,*" except upon the terms prescribed in that Act. Acts 1895, Ch. 160, Sec. 2.

Among the terms and conditions prescribed for the doing of business by foreign corporations, is: Semiannual reports—July and January—of premium receipts, and payment of a tax of 2½ per cent. thereof, under penalty of forfeiture of license if same is not paid within sixty days. (Sec. 19.)

The Revenue Acts levy a privilege tax upon foreign insurance *companies,* of "2¼ per cent. of gross premium receipts, payable semiannually, January and July." Acts 1893, Ch. 89.

It will be observed this tax is laid upon the *companies,* not upon the premiums, though measured by the latter. Acts 1897, Ch. 2.

And that Act further provides "that any and all parties, firms, or corporations exercising any of the foregoing *privileges* must pay the taxes as set forth in this Act for the exercise of said privileges, whether they make a business of it or not; and this Act shall not be so construed as to exempt any person, firm, or corporation whatever exercising any of the foregoing privileges from payment of the taxes herein prescribed for the exercise of said privileges." Acts 1897, Ch. 2, Sec. 14.

The same provision will be found in the other

revenue Acts. Among the privileges enumerated and taxed by these Acts is "insurance companies" —the privilege of doing insurance business. This tax is measured by premium receipts.

These provisions do not admit of the construction that the Legislature intended to exempt foreign insurance companies from this tax, measured by the gross premium receipts, in any case where it had power to impose it.

It imputes extreme folly to the Legislature to suppose that it intended to exempt foreign insurance companies from a tax that it laid upon domestic companies.

The statutes have therefore laid the tax sued for, and the State is entitled to recover unless these statutes are, for some reason, invalid or ineffectual.

Revenue statutes are not penal in their character, and are not strictly but fairly construed.

2. *The statutes, above cited, which make the defendant company liable for the privilege tax of* $2\frac{1}{2}$ *per cent. of its "gross premium receipts" collected on its old business after it had ceased to take new business and had withdrawn its agents from the State, are not unconstitutional, or for any other reason invalid.*

These statutes are not obnoxious to the State Constitution.

It provides that "the Legislature shall have power to tax merchants, peddlers, and *privileges*

in such manner as they may from time to time direct." (Art. II., Sec. 28.)

This clause has been construed to give unlimited discretion to the Legislature in the creation and taxation of privileges. 86 Tenn., 136; 3 Head, 414; 8 Heis., 456, 544; 92 Tenn., 369.

These statutes are not in conflict with the Federal Constitution.

The assumption and payment of this tax is one of the terms and conditions upon which foreign insurance companies are permitted to enter the State and to continue business therein. Acts 1895, Ch. 160, Sec. 19.

And it is a valid condition, even if foreign insurance companies are required to pay a greater tax than domestic companies engaged in the same business.

Foreign corporations are not citizens within the clause of the Federal Constitution providing that "the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States." *Paul* v. *Va.,* 8 Wall., 168; *Bank* v. *Earle,* 13 Pet., 538; *Ducat* v. *Chicago,* 10 Wall., 410; *Mining Co.* v. *Penn.,* 125 U. S., 181; 1 Joyce on Ins., § 328; 1 Thomp. on. Corp., § 12; 6 Thomp. on Corp., § 7928; 13 Am. & Eng. Enc. L., 845.

The business of a foreign insurance company is not interstate commerce. *Paul* v. *Va.,* 8 Wall.,

168; *Hooper* v. *Cal.,* 155 U. S., 648; 1 Joyce on Ins., § 328.

Foreign corporations are "persons" within that clause of the XIV. Amendment which provides that "no State shall deny to any person within its jurisdiction the equal protection of the laws," but this clause does not affect the power of the State to exclude foreign corporations from the State, or to prescribe any conditions it may choose for their admission. 13 Am. & Eng. Enc. L., 846; 119 U. S., 110; 118 U. S., 394; 125 U. S., 181.

The reason is that foreign corporations are not "within its jurisdiction" until they have performed the conditions upon which they are entitled to admission into the State.

"Any other construction of this clause would entitle foreign corporations to the same privileges as domestic corporations, and, as has been seen, it is within the power of the State to exclude foreign corporations entirely." 13 Am. & Eng. Enc. L., p. 846; 119 U. S., 110.

"There is nothing in the Federal Constitution that prevents a State from prescribing the terms on which foreign corporations shall come within its borders and carry on business with its citizens. The whole matter of admitting foreign corporations to do business in a State rests absolutely in the discretion of the Legislature of the State. The terms it imposes may be reasonable or

unreasonable. The comity ordinarily extended is accompanied by no legal sanction. It is never extended when the existence of the corporation, or the exercise of its powers, is prejudicial to the interests of the State, or repugnant to its policy; and although it has been extended, it may at any time be recalled." 13 Am. & Eng. Enc. L., 860, 861; *Dugger* v. *Ins. Co.,* 95 Tenn., 245; *State* v. *Phoenix Ins. Co.,* 92 Tenn., 431; 119 U. S., 110; 136 Mo., 391.

The constitutional provisions are designed to protect *rights;* they take no cognizance of matters of mere *comity.*

The statutes in direct terms impose the tax sued for, and these statutes are valid.

The conclusion is inevitable that the State is entitled to recover.

If there could be any doubt, even a serious one, as to the validity of these statutes under the Federal Constitution, the State Court should sustain the statutes, in order that the matter could reach the Federal Supreme Court. The State has no appeal, while the other party has appeal.

Devices to evade State taxation do not meet with favor, or even toleration, in the United States Supreme Court. *Mitchell* v. *County,* 91 U. S., 206; *Bristol* v. *County,* 177 U. S., 143; see, also, 174 U. S., 70.

3. In answer to some of the arguments made in

support of defendant's contention, we submit the following propositions:

(1) *That the defendant's policies, upon which premiums were collected after its so-called withdrawal in 1894, are the identical policies taken by its local agents operating and doing business in the State prior to that time. Life policies are entire and continuing contracts, not mere contracts from year to year. To continue a business, established while defendant was in the State, even to wind it up, is to do business in the State.*

In the case of *Ins. Co.* v. *Statham,* 93 U. S.; 30, Mr. Justice Bradley, passing upon this very question, says:

"That the contract (an ordinary life policy with forfeiture clause for nonpayment of premiums) is not an *assurance for a single year,* with a privilege of renewal from year to year by paying the annual premiums, but that it is an *entire contract of assurance for life,* subject to discontinuance and forfeiture for nonpayment of any of the stipulated premiums. Such is the form of the contract, and such is its character. . . . *Each installment* is, in fact, part consideration of the *entire insurance for life.* It is the same thing when the annual premiums are spread over the whole life. The value of assurance for one year of a man's life, when he is young, strong, and healthy, is manifestly not the same as when he is old and decrepit.

"There is no proper relation between the annual premiums and the risk of assurance for the year in which it is paid.

*"This idea of insurance from year to year is the suggestion of ingenious counsel.*

"The annual premiums are an annuity, the present value of which is calculated to correspond with the present value of the amount assured, a reasonable percentage being added to the premiums to cover expenses and contingencies.

*"The whole premiums are balanced against the whole insurance."*

In *Insurance Co.* v. *Heidel,* 8 Lea, 498, Judge Cooper, passing upon this question, cited the above case with approval, and said:

"The contract is not *an assurance for a single year,* with the privilege of renewal from year to year by paying the annual premiums, but *it is an entire contract of assurance for life,* subject to discontinuance or forfeiture for nonpayment of any of the stipulated premiums."

The same doctrine is held in 49 Me., 200; 59 Ill., 123; 19 N. Y. Supp., 481; 78 N. Y., 114. And has the approval of Mr. Joyce. 2 Joyce on Ins., Sec. 1102. It likewise has the sanction of sound reason.

. The policy on its face purports to be a continuing contract.

The parties contemplate its continuance, certainly; for the real benefit of the contract does not

accrue to the beneficiary until after the assured's death.

The company's liability does not accrue until after the assured's death.

If the premiums are paid no new or renewal policy issues. The *old* one remains outstanding. The premiums are paid on the old contract and according to its terms. A new policy.. would not issue for the same premium, as the assured is a little older.

The State, in fixing as a condition for defendant's admission, a tax measured -by a per cent. of its premium collections, instead of a gross annual sum, or round charge for each application, or each policy, or each adjustment, must have had in view this peculiar feature of the insurance contract, which had been declared by decision of this Court, by which the company would be required to pay tax during the life of each policy. Otherwise a severer tax would probably have been imposed: Say upon applications, issuance of policies, or adjustment of losses, or upon all. But, instead, the equitable tax which ran with the life of the policy was imposed for the privilege of conducting the insurance business.

These contracts were made in Tennessee, under an agreement on the part of the defendant company, by which it obtained admission into the State, that it would pay the tax measured by

the premium receipts from the policies so long as they continued in existence.

If these premiums were not paid on the old policies, then defendant was engaged in taking new business in the State through public, instead of private, agencies.

(2) *Premiums collected, through the agency of the mails or express companies, on policies taken by the defendant before its so-called withdrawal from the State, are to be treated as received within the State. The mails and express companies became the insurer's agents.*

Inasmuch as the tax is levied for the privilege of doing the entire business of insurance, and attaches if any part of that business is done, it is, perhaps, not material whether the premiums were received in the State, if the applications were taken and the policies issued in the State on which the premiums accrued. Though measured by a per cent. of premiums received, the tax is not one on premiums, but on the companies for the privilege of engaging in the insurance business or some part of it. Companies are liable if they do anything, "whether they make a business of it or not."

If this were not true, small revenue could be realized from privileges, as few persons exercise any privilege to the fullest extent possible or in all its parts.

State *v.* Insurance Co.

But not only were the defendant's policies solicited and issued in the State, but it also collected the premiums thereon within the State.*

The premiums were sent. by letter or express.

The law applicable in such case is thus stated by Mr. Joyce:

"If the premium is authorized to be paid through the mail, *it is paid by depositing a prepaid letter, properly addressed, in the postoffice containing the remittance,* and the party has done all that can be required in order that it should reach the other party in due course of time. . . . And it is held that depositing a letter, properly addressed, in the post office, postage prepaid, operates as a payment *at that time,* when payment of premiums by mail is authorized by the insurer." (2 Joyce on Ins., Sec. 1163.)

---

*The proposition that delivery to a common carrier is delivery to the consignee was twice decided by oral opinions at the December term, 1900, of the Supreme Court at Nashville.

In the case of *Harris & Filson* v. *State* the appellants had been convicted of selling liquor without license in Trousdale County. The facts were these:. Harris & Filson were duly licensed as retail liquor dealers in Sumner County, and had a saloon in that county. Curtis West, living and being at the time in Trousdale County, ordered from them by telephone one and one-half gallons of liquor. They filled the order, delivering the jug of liquor to an express company in Sumner County, directed to West in Trousdale County. It was sent c. o. d.

The Court held, upon these facts, that the delivery of the goods to the carrier, c. o. d., in Sumner County, addressed to West in Trousdale County, was a delivery to West in Sumner County, and that the sale was made and completed in Sumner County, and that the appellants, having license in Sumner County, were guilty of no offense. The authorities upon which this decision was made are: 43 Ark., 353; 71 Ala., 568; 73 Maine, 278; 96 Penn., 449; 22 W. Va., 743 (S. C., 22 L. R. A., 430); 97 Mass., 89.

The other case was that of *Duncan* v. *State.* Duncan was convicted of selling liquor without license in Hickman County. The facts were that Duncan, as traveling salesman of B. W. Hooper & Co., who were duly licensed wholesale liquor dealers at Nashville, took an order to his principals, but subject to their approval or rejection in Hickman County, for one gallon of liquor. He forwarded the order to the firm at Nashville, who accepted it, and the liquor was shipped to the purchaser. Neither Duncan nor his principals had license to sell liquor in Hickman County. The Court held that the sale was made and completed in Davidson County; that it was a sale by Hooper & Co., and not by Duncan, and that delivery to the carrier was delivery to the purchaser in Davidson County. The case was reversed.

The first of above cases was decided by the Chief Justice and the other by Judge Beard.—REPORTER.

And delivery of premiums to an express company operates as payment from date of such delivery, although the same may be stolen by an agent of the express company. *Id.,* Sec. 1165.

Delivery of a bill or note to the postman is sufficient. 1 Daniel, Neg. Inst., Sec. 67; *Kirkman* v. *Bank,* 2 Cold., 403-406.

It is familiar law that a common carrier is agent of the consignee, and that, ordinarily, delivery to it is delivery to the consignee.

So, delivery of letter into post office is delivery to the addressee, and entitles him to it at once as against the sender.

Even the premiums are collected in Tennessee.

If this is not true, then the receipts for premiums are delivered in Tennessee, being sent by mail.

(3) *By coming into the State and taking policies, and continuing to collect premiums thereon, the defendant agreed and assumed to comply with all terms and conditions imposed by statute upon foreign insurance companies, including compliance with tax laws.*

The State had absolute discretion in the matter of admitting or excluding the defendant, and in prescribing terms for its admission.

We have already noted the conditions imposed as regards taxation.

The defendant engaged to comply with these terms and conditions by accepting the State's comity.

The defendant had no business in the State before its admission. It had no right to any.

What it acquired and did while operating in the State was by the State's comity. Its permission was limited to do business while in the State, not after. It was no part of the State's consent or the defendant's license to take from the State, on leaving, anything more, in the way of business opportunities, than it brought with it.

Is it a fair construction of the transaction by which defendant, as a matter of comity, was permitted to enter the State and engage in business with our citizens, to hold that it may at will, after securing large business advantages, throw off all its obligations to the State, refuse to pay taxes, withdraw from supervision of the Insurance Commissioner, and at the same time take the profits of such business?

To permit defendant to compete in this way with domestic companies, without payment of taxes, would bring it within the category of companies to which comity is never extended. It is said that comity is "never extended when the existence of the corporation or the exercise of its powers is prejudicial to the interests of the State or repugnant to its policy."

Would not such a contract be a severe arraignment of the Legislature for folly, as it had full powers to prevent such result?

Under defendant's contention this company can

take all the policies it can get for a six months and then go over the border and collect the premiums, and thereby evade taxes on the business it does in competition with taxpaying companies. It can repeat this experiment as often as it chooses.

Its act, in such case, would be legal though savoring of the moral quality that attaches to that of a guest who takes, on leaving, the valuables of his host.

This is not a reasonable construction of the statutes under which the State extends its comity to foreign corporations, and one which they cannot, with any degree of fairness, insist upon.

(4) *It is sufficient, to give the State jurisdiction to tax and regulate defendant's business, if any part of it, however slight, transpires within the State. It is not essential that defendant should be in the State by private or local agents.*

The statutes, as we have seen, are broad enough in their provisions to reach this company after its so-called withdrawal.

The power of the State to pass these statutes is the matter now under consideration.

The State has jurisdiction even in criminal matters, in such cases.

"Where a man, standing beyond the outer line of our territory, by discharging a ball over the line kills another within it; or, himself being abroad, circulates libels here; or in like manner

obtains here goods by false pretenses; or does any other crime in our locality against our laws, he is punishable, though absent, the same as if he were present." 1 Bish. Cr. L. (New), Sec. 110.

"If a material part of any crime is committed on our soil, though it is the lighter part, legislation, with us, may properly provide for the punishment of the whole of it here—at least where no jurisdiction abroad has, in fact, been taken." (*Id.*, Sec. 116.)

"If the offer (to bribe) is made by letter through the post office, the writer commits a complete offense at the place where he deposits the letter, as well as at the place where it is received." (*Id.* (1), Sec. 88.)

Our criminal statutes and decisions recognize the same principle. Code (M. & V.), § 5802; *Williams* v. *State*, 92 Tenn., 275.

It is not essential that a party be in the State in order to do business in the State.

"Although the contract is made and dated in one State, but is to be binding only on delivery, the laws of the State where the insured is a resident, and where it is delivered to him, govern the contract.

"And, as a general rule, the delivery of the policy to the insured in the State in which he resides, and the payment by him of the first premium in that State, renders the contract sub-

22 P—21

ject to the laws of such State." 1 Joyce, Sec. 230, citing 58 Fed. Rep., 541; 7 C. C. App., 359; 160 Mass., 414.

Foreign corporations cannot withdraw themselves from a State into which they have entered, by a provision in their policies. 1 Biddle on Ins., Sec. 84; 13 Fed. Rep., 526.

So of other corporations seeking to withdraw from the jurisdiction to tax them. 177 U. S., 143; 174 U. S., 70; 91 U. S., 206.

This company has been held, upon the facts of this record, to have been doing business within the State from 1870 to 1894. *Ins. Co.* v. *Spratley,* 172 U. S., 611; *Ins. Co.* v. *Spratley,* 99 Tenn., 334.

True that was a different statute, but its provisions are not so strict as those of the statutes now under consideration.

Insurance companies are held to be doing business in the State, without having local agents therein, in these cases: 7 Mo., 388; 65 Ill. App., 355; 73 Miss., 321, 330; 89 Wis., 545 (S. C., 46 Am. St. Rep., 855).

The authority of the Allgyer and Norton cases cited by defendant is not controverted.

The former involved the right of a *citizen* to take insurance in another State in a foreign company. Foreign corporations are not citizens, nor entitled to the rights of citizens.

The Norton case was under the noncompliance

Act, which is construed with great strictness to prevent hardship. These cases are clearly distinguishable from the one at bar.

"The distinction," says Mr. Thompson, "is between the case where the company procures a risk within the foreign State by *its own affirmative action* or where it allows a broker to procure a risk for it for his own pecuniary gain, and the case where a resident of a foreign State, of his own volition, solicits the writing of a policy upon his own life or property." 6 Thompson on Corporations, Sec. 7937.

The defendant solicited its policies in the State originally.

It obtained and holds them by its own affirmative action. That is the test, even where the company has never been in the State by its agents.

The defendant put into its policies such forfeiture clauses as compelled their continuance or severe loss to the policy holder.

This defendant took its policies in Tennessee by local agents originally, but even if this were not true they were renewed under stress applied—the affirmative action of the defendant.

(5) *The supposed injustice resulting to foreign insurance companies from want, or supposed want, of power to withdraw from the State is imaginary.*

The terms or conditions upon which foreign

corporations are permitted to enter the State may be reasonable or unreasonable at the discretion of the Legislature, which has the power of absolute exclusion. The corporation accepts these terms and conditions voluntarily if at all.

It would have no right to complain if one of these prescribed conditions which it accepted denied it the right of withdrawal. It could not complain of injustice or hardship.

But . the law does not deny good faith withdrawal.

Undoubtedly a foreign company may stipulate with its policy holders for the contingency of its withdrawal if it chooses.

It may reinsure all its risks and go out.

What it is forbidden to do is to withdraw from burdens without withdrawing from benefits. It is forbidden to go out to avoid taxes and, at the same time, stay in to reap profits.

It is not permitted to take an unfair and dishonest advantage of the comity that the State has extended to it, and place itself in a position, by reason thereof, to compete, without payment of taxes, with the taxpaying companies of the State.

The guest who has robbed his host, has just as much right to complain that the host objects to the operation.

What are all of our insurance laws for the protection of citizens against insolvent and unreliable companies worth, if these companies may

defy the State's authority and do business with the citizens?

No company wanting to go out of the State in good faith and in fact, not merely in form, will meet any serious obstacles. This, however, is not a controlling fact in the case.

(6) *The supposition that Tennessee policy holders are to suffer loss, and that foreign insurers are to get great gain from the Court's sustaining the State's contention that such companies are not permitted to maintain an old business in the State without payment of taxes, is a very clever invention of ingenious counsel.*

This objection comes from an insurance company, not from a policy holder. This fact discredits it.

It is assumed that a foreign insurance company that has had its license revoked for its own fault —*e. g.,* fraud or insolvency—and is thereby forced to quit the State, or has voluntarily abandoned its business because of its unwillingness to pay taxes or otherwise comply with the conditions upon which it was admitted into the State, can, in some way, acquire an advantage, on that account, over its Tennessee policy holders.

It is difficult to conceive what it is the insured can lose to the insurer in such case.

The insurance company that from fault or choice refuses to qualify itself to carry out its contracts,

is in no situation to take advantage of its policy holders.

It is a condition of every policy that the company is qualified to do business, and will remain so. Surely, it is no part of the insured's business to look after the qualification of the insurer. If the insurer makes default, it is liable in damages.

The Court will find some difficulty in defining what it is that the insured loses to the insurer by the demand of the State, made in behalf of fair dealing and the safety of the citizens, that the insurer shall pay legitimate taxes and submit itself to such supervision as the law deems essential to the safety of those insured.

The company, in paying this tax and submitting to supervision, does no more than is required of the safe and solvent companies, foreign and domestic, that do a legitimate business in the State.

Suppose a company having policy holders in the State has become insolvent and unable to qualify under our laws to continue business, can it set up the plea that it will injure these policy holders to enable it to continue business in violation of law? Has a company that wilfully declines to comply with tax and other laws any stronger claim?

(7) *An insurance policy, with forfeiture clause for nonpayment of annual premiums, is not an*

*unilateral contract binding the insurance company but not obligating the insured.*

It has already been shown that these policies are not mere contracts from year to year, but entire and continuing contracts. If the contract of the policy is unilateral it is wanting in mutuality, and void.

"The reason of this is that a promise is not a good consideration for a promise unless there is an absolute mutuality of engagement, so that each party has the right at once to hold the other to a positive agreement." 1 Par. Cont., pp. 448, 449, and notes.

Defendant would hardly admit that it has been engaged in issuing this sort of policies. It is true each party has not the same kind of remedy for breach of the contract, but each has a remedy.

The insured must obtain his remedy by suit. The insurer has provided a summary remedy for its indemity for breach, to wit, forfeiture of all premiums that it has received.

The matter is a little one-sided, but the one-sidedness is in favor of the insurer. He perhaps reaps as much benefit, probably more, from breach than from performance of the contract by the assured.

In conclusion, this is a contest for the life of a young, prosperous, revenue yielding department of the State government.

The contest is between the State and foreign

insurance companies, whom it had the right to exclude entirely or to admit on harsh or impossible terms. If this company succeeds, then all foreign companies can withdraw, and through the mails, by a little effort, keep up that business in the State, which yielded last year over $143,-000 revenue to the State, without paying one dollar taxes. This company has succeeded in keeping up for six years, without effort, a very valuable business. Cannot others do the same? Nearly the entire life insurance of the State is done by foreign companies.     G. W. PICKLE,

*Attorney-general.*

ADDITIONAL BRIEF SUBMITTED BY G. W. PICKLE.

I. There is no escaping the conclusion that the statutes do tax this company, and since 1897 in terms so direct and specific as to admit no dodging the conclusion. Acts 1897, Ch. 2; Acts 1899, Ch. 432.

The tax is imposed whether it be a condition or not. But it is a condition, and so made by both the Acts of 1875 and 1895.

The Acts of 1875, Ch. 66, provides that no foreign insurance company shall "transact any business of life insurance in this State without *first* obtaining a license therefor from the Bureau of Insurance and a certificate of authority for each agent employed." Sec. 1.

And that the Commissioner is required to issue "a

license to transact the business of life insurance within the limits of the State upon the terms and conditions set forth in this section (§ 3) and those herinafter provided." Sec. 3.

By Sec. 5 the payment of tax is required "on gross premium receipts, payable on the first days of January and July of each year, on sworn statement of the president and secretary of the company." Sec. 5.

And sworn statement of income. is made a condition under Sec. 2 of this Act.

The supposition that subsequent Act of 1895 was materially different on this part is a mistake. It was a mere collation of older Acts in the main. That Act, however, makes it absolutely clear that the payment of this tax is a condition, though that is not material.

Under Sec. 19 of that Act a foreign company, failing to pay this tax is "debarred from transacting any business of insurance in this State until said taxes and penalties are fully paid, and the Insurance Commissioner shall revoke the certificate of authority granted to the agent or agents of that company to transact business in the State." Compare Sec. 2 of the Act.

The defendant company cannot evade the effect of statutes passed subsequent to its so-called withdrawal. If the State could have made payment of this tax a term or condition of admission, or imposed it at that time, then the State could

make it a term or condition of the company's continuance in the State, or impose it at any time it chooses.

It is imposed and binding on defendant, if it can be made so at all.

Defendant has no vested right in the status of the insurance laws existing at date of its admission. This is clear.

The State's right to recall a company's license and exclude it from the State is just as absolute as its right to admit or exclude originally. Any terms may be imposed for the privilege of remaining in the State. (See former brief.)

But the Act of 1895 provides for this very thing thus: "That nothing contained in this Act shall be so construed as to prevent the repeal or amendment of the same or any section thereof by the present or any future General Assembly of this State."

The defendant entered the State with this provision in the law.

The question comes to this: Can the State tax a company in the situation of this company at all; if it can, it has done so. If it has not done so, then it cannot do it at all.

II. It is clear this company has not withdrawn from the State or complied with the terms upon which it is permitted to do so.

It was required by Act of 1875, and subsequent Acts, to make certain deposits for the benefit of

State *v.* Insurance Co.

policy holders it might obtain in the State. Acts 1875. Ch. 66, Sec. 3; Acts 1877, Ch. 108; Acts 1895, Ch. 160, Sec. 9.

Also, to file power of attorney for acknowledgment of service of process.

In regard to this deposit, Sec. 24, Acts of 1895, Ch. 160, makes this subsequent provision: "And he [the Commissioner] may return to the trustees or other representatives authorized for that purpose, of a foreign insurance company, any deposit made by such company, when it shall appear that such company has ceased to do business in the State and is under no obligation to policy holders or other persons in the State, or in the United States, for whose benefit such deposit was made."

There is no other method prescribed for withdrawal from the State except to wind up its entire business and cancel every liability to citizens of the State, and we insist to the State as well. Defendant came or remained in the State on these terms.

### OPINION ON PETITION TO REHEAR.

WILKES, J. A very earnest petition to rehear is filed by the State in this case, and the Court is asked to reconsider and reverse its original holding.

The petition, taken alone, presents nothing new, but a very elaborate brief is presented by the

Attorney-general, setting out very fully what it is feared will result from the holding, and going very elaborately into an argument of the questions passed on in the original hearing. Among other things it is said that foreign insurance companies will take advantage of this decision and avoid altogether the payment of taxes, and thus deprive the State of a very large and increasing source of revenue.

Of course every conpany which comes within the proper operation of the decision will be affected by it, but it will only apply to such as bring themselves strictly within its provisions, and it cannot be used as a pretext by companies not in like conditions, to evade the payment of any legitimate tax imposed. It is said by the Attorney-general that the construction placed upon the Act will permit foreign insurance companies to solicit, issue, and deliver policies, and to adjust losses through local agents or agencies in the State without payment of any taxes, provided they arrange to have the premiums sent by mail or express direct to the home office or other agency outside of the State. The opinion of this Court does not admit of such construction, but on the contrary repels it, and holds that if the companies solicit, issue and deliver policies or do any other thing through local agents in this State, whether such agents are the express companies or the postal authorities, or agents exclusively of the

company, they would not fall within either the letter or spirit of the decision.

We think that under the facts of this case neither the express companies nor the postal authorities can be considered as the agents of the insurance company, but they are, when used, the agents of the insured to transmit the premiums to the company's offices beyond the State. Until the money reaches the home or foreign office of the company and is received by it, it is not the money of the company, nor is the insured entitled to the renewal. If the money is lost *en route,* it is not the loss of the company, but of the insured. Premiums are not authorized, expressly or by implication, to be paid through the mail or express company, but only at the home or foreign office, and the renewal receipts are then delivered. It is true the Acts of 1897, Ch. 2, and of 1899, Ch. 432, provide, in substance, that life corporations of other States and foreign companies ceasing to transact new business in the State, shall continue to pay the taxes herein provided on business in force and until same be terminated.

We have no doubt but that a foreign company which enters the State after the passage of such an Act, or which, being in the State prior to its passage, remains in the State and doing business in it after the Acts take effect, are subject to the provisions of the Acts even if they after-

wards withdraw, but these acts do not apply in the present case, because the defendant company withdrew from the State in 1894, and was not doing business in the State when the Acts took effect in 1897 and 1899. Nor was it made a condition upon which the company originally entered the State that it should continue to pay, after its withdrawal, upon business then in force.

This decision does not in any way question the right of the Legislature to impose such tax requirements upon foreign corporations as it may see proper, as a condition for their entering the State, nor such as may be legitimate for their continuing to do business in the State, but it only applies to companies which withdraw from the State at a time when there is no Act in force taxing them for receiving premiums beyond the State and which have not expressly nor impliedly consented to such taxes. The insurance Act of 1895, Ch. 160, Sec. 2, has no application to this case, but only applies to the making or entering into contracts of insurance. The crucial question in this case is whether the company, under the facts stated, is "doing business" in the State. Unquestionably the Legislature may have made it a condition precedent to entering the State, that the company shall continue to pay taxes upon its receipts after its withdrawal, and it no doubt can make it a like condition for its future withdrawal, but it had not done so when

this company withdrew from the State, but the attempt in this case is to impose the tax after the company has withdrawn from the jurisdiction of the State.

The Attorney-general has formulated quite a number of hypothetical cases, none of which are covered by the terms of the present decision and which are not covered by this opinion. The decision is limited, as are all others, to the facts of the case, and is determinative only of the questions strictly at issue in the case. Whether other companies occupy exactly the same status as the present company we are not advised, and we express no opinion as to those who do not occupy the same status. We think there is no error in the opinion originally rendered in the case, and the petition to rehear is dismissed.